And we move to the second case this morning, BenYeHudah Whitfield v. Cowan. Mr. Baddorf-Barnes? Good morning, may it please the court. My name is Christopher Baddorf-Barnes and I represent Mr. BenYeHudah Whitfield, plaintiff below and appellant. This is a case about a man who was incarcerated for one and a half years longer than he should have been because he refused to sign a form. This was not a form that he was required to sign and he did sign this form shortly thereafter. At issue in this appeal are claims under the First Amendment and Eighth Amendment against defendants Betsy Spiller and Warden Donald Gates. Mr. Whitfield should have been released from prison on January 7, 2010. He was not released because he refused to sign an electronic detention program agreement or what we've referred to in our briefing as the EDPA. But the EDPA is not a form that Mr. Whitfield was required to sign. Electronic monitoring was a condition of Mr. Whitfield's mandatory supervised release. Electronic detention, which is what the EDPA concerns, was not. On its face, this form did not apply to him. Relevant statutes and the regulations are clear. This was not a form that Mr. Whitfield was actually required to sign and the defendants don't argue. Didn't it say at the top that it was for sex offenders? It does say at the top that it's for rather that that section of the form applies to sex offenders. Which he was not. Which he was not, that's correct. And the conditions which it speaks to and on the the page that he was provided only speaks to sex offenders. So what do we do with the fact that let me put it this way. What would your response be if it appeared that Spiller was just making a good faith mistake about what the law was, thought that people leaving prison in Mr. Whitfield's situation needed to sign this form, and therefore took the actions that she took? Well, Spiller was on notice that Mr. Whitfield was claiming that he didn't have to sign this form. She was provided with the information. Mr. Whitfield made very clear that his claim was that he did not have to sign this form. And she was the IDOC employee who was responsible in this instance for release procedures. She supervised the employees that were responsible for release procedures, and she was brought in on that day to deal with this issue. So she was the one who's supposed to have the knowledge to figure out whether or not he needs to sign this form. And he made it clear he didn't think he needed to sign the form. He made it clear then again in his January 11th grievance that he did not believe this form applied to him. And at that point, once Spiller's on of the possibility that he doesn't need to sign this form as a precondition for his release, she then has a duty to go and either figure that out for herself, or if she can't, go to someone else who can to forward this on and make sure that was done. And she conducted no investigation into whether this was actually a form that was required to be signed. Now can I take it that the fact that this dispute about whether the form had to be signed or not was understood to be a form of protected First Amendment activity that we aren't here needing to worry about whether Mr. Whitfield was entitled to say, it's my belief I don't have to sign this form. Of course, they don't give him the full form anyway. They only give him this signature page, so he doesn't know what he's signing. Yeah, that's right. The district court accepted that this was a protected speech. His refusal to sign this form is protected speech. That hasn't been argued on appeal. I don't believe that's before this court. With regard to Ms. Spiller, did she have any personal involvement in declaring Whitfield to be an MSR violator? So Spiller was the one who initiated the process of him being declared an MSR violator. The idea that his conduct violated MSR appears to have originated with defendant Spiller. Spiller told Mr. Whitfield on January 7th that if he didn't sign the form, he was going to be declared an MSR violator. This is notwithstanding the fact that he had not yet been released on MSR, and then on that same day, a person in the office that Spiller supervises recalculated his sentence on a form for MSR violators, and this occurred days before he was actually charged with having violated a term of his MSR. And then when Spiller answered his grievance on January 12th, she stated that he had violated the terms of his MSR. So that's where this idea comes from, it seems, that Mr. Whitfield violated the terms of his MSR. The formal determination that he'd violated the terms of his MSR was not made by Spiller. So that's where we're getting to the personal involvement question, because the way that it's been described in terms of her role, her part in the process was an interaction with Mr. Whitfield with regard to the form. What I'm trying to determine is whether or not she had personal involvement in the circumstance such that Whitfield served more time than he needed to. Do we know the answer to that? Well, she was the one who made the decision not to release him on January 7th. And the basis that she was not releasing him was because he hadn't signed this form, and she believed that to be a violation of his MSR conditions. In fact, he didn't need to sign this form. So could I just interrupt and say, so if your answer is at least on January 7, she was in fact the person directly responsible, whether her direct responsibility accounted for only a week extra time incarceration, whether it accounted for the full 18 months, or whether it accounted for something in between a week and 18 months, would probably more go to a damages issue than it would a personal involvement issue. I would agree with that, yes. And if she has that role, what role does Gates have then? He's the warden, right? Well, so with respect to Gates, our argument with respect to Gates is that he's personally involved in the term of disciplinary segregation and is receiving commissary restriction in grade C status. We are not otherwise arguing that Gates is involved here. I saw very little direct evidence of Gates's involvement. He says things like, well, I like to keep track of who's in disciplinary segregation, but it sounded very much like a management perspective, not that he was the one calling the shots. So, I mean, Spiller, I can see your argument, but Gates is just being the warden, isn't he? Well, I agree that Spiller is a much more central player here, and with respect to Warden Gates, so Warden Gates, his testimony, I think a reasonable jury could conclude from that, that he knew of Mr. Whitfield's placement in the reason for this placement in segregation. He also testifies that he approves of the use of disciplinary segregation as a punishment for a person who refuses to sign an electronic detention program agreement. But you're not making a Monell argument about an unconstitutional policy or primary decision maker. It's all direct liability, right? That's correct. Everything is direct liability, and the focus is principally on Spiller's behavior here. If Spiller is the decision maker, you say, who resulted in Whitfield being declared MSR violator, what role does the Prison Review Board have? Well, the Prison Review Board did make a determination that Mr. Whitfield had violated the terms of his MSR on February 25th, but I think it's important to understand the context there. Mr. Whitfield effectively won at that PRB hearing. They declared him an MSR violator, but they determined that he could be released at that time. And they had no real incentive to to reach out and say, oh, you know, Spiller made a mistake back on January 7th, and you should have been released then, and also it's the case that you can, you're free now. So the issue was essentially moved at that point. Wasn't it by that time that the fact that the slot at Henry House had been taken by somebody else or closed up? I don't know whatever happened to it, but it was unavailable. Is that right? That's correct. Yeah. That's correct. It was between the time, between January 7th and that hearing at some point, his slot at the Henry House was lost. And you have a different argument against Spiller for failing to find him an alternative place. Is that right? That's true. That's still part of the same, just she was responsible for for some period of, I'm going to keep that a little bit open-ended, but some period of additional detention. That's correct. So we're arguing also that Spiller was responsible for the delay in his release plan following the approval by the the Prisoner Review Board on February 24th, which would have allowed him to to have a release location. So Spiller was in charge of the office, whose responsibility it is to to locate an inmate, a release location. And Spiller went and told Mr. Whitfield after it was approved by the PRB that he could be released, told him that the IDOC employees were intentionally delaying his release plan because they were angry that he had not signed the EDPA. And this gets to your legal argument, if I'm not mistaken, because you have argued, as I understand this, that the District Court wasn't applying the correct standard to the First Amendment aspect of this case, which is just whether these things would deter a person of ordinary firmness, and instead looking at something that looks much more like, you know, you put me in administrative detention and I shouldn't have been there from a due process point of view. I'm sorry, Judge, could you restate the question? Well, the point is that the the burden on his rights for the First Amendment relates only to whether these retaliatory, allegedly retaliatory, actions would deter somebody from expressing himself in the way that Mr. Whitfield did, whereas the District Court was looking for some substantial and different nature of his incarceration, which belongs to a different constitutional provision. That's correct, Your Honor. The District Court was applying the 14th Amendment analysis of whether there had been a deprivation of due process, which is a fundamentally different question. Right, okay. So I'd like to talk for a moment about Spiller's failure to investigate Mr. Whitfield's prolonged incarceration. Under this circuit's precedent, it's a violation of the Eighth Amendment to incarcerate an inmate without penological justification, which includes ignoring a risk that an inmate is held without penological justification. So Spiller both had notice that Mr. Whitfield was claiming he didn't need to sign the EDPA. This was clear in his grievance where he specifically stated that he asked Spiller whether she was aware of any basis which authorized her to detain him beyond his term if he refused to sign the EDPA. It was Spiller's responsibility to determine whether he signed the EDPA or whether he could be released on January 7th as the supervisor of the staff in charge of police procedures. Her job duties and the role that she assumed in the administration was one where she was responsible for correcting this issue. All of the bases that she provides for her alleged reasonable basis for believing that he had to sign it fall flat. They don't make sense. The PRB order itself only states that he was subject to electronic monitoring. It says nothing about a signature requirement. It says nothing about electronic detention with which this form related to. And the statute which she cites too specifically states that it applies to electronic detention and does not apply to persons subject to electronic home monitoring. And I'd like to if I can reserve the Good morning and may it please the court. My name is Alexandrina Shrove, Assistant Attorney General on behalf of Betsy Spiller, Donald Gates and the other defendant appellates. Defendants Spiller and Gates were minimally involved in Mr. Whitfield's release from custody and as such the district court properly granted summary judgment to them for three reasons. But that may, can I just say I mean that may be true of seems to have played a central role in the key determinations about this program. And before you get too far I understood you in your briefs to be conceding that requiring an EDPA signature as a condition of release was in fact a mistake. It was contrary to section 588 or sorry 5885 of the Illinois statutes. Is that correct? Not necessarily your honor and we have to look at what Ms. Spiller was thinking at the time. Well no that's just the objective question whether she made a mistake or whether she was being vindictive you know that's a whole different inquiry and I understand that. But I understood you to say that it was a mistake that it's not correct to say that 730 ILCS section 5 slash 5885 requires an inmate signature in this situation. And I would add when I think of the number of cases I've seen over the years where people sign forms and they don't bother to read the form or they just sign the last page and the court says tut tut you know you should read what's in front of you. Mr. Whitfield was pretty reasonable to say I don't want to sign a blank check. I need to be able to at least to read the full form before I understand what I'm agreeing to. That seems eminently reasonable to me. Your honor the even if it was not required of Mr. Whitfield to sign this form it was a reasonable interpretation. It's not completely clear from the statute alone that he was required to sign this form and I want to clarify a factual point before I get too much further into the argument that I think really has gotten a little bit lost in the briefing of this issue that when we look to the conversation that Mr. Whitfield had with Ms. Spiller on January 7th and also what he complained about specifically within his January 11th grievance was primarily that he was he did not think that he was required to be on electronic monitoring whatsoever and so his complaints of having to sign the electronic monitoring document stemmed from the fact that he didn't think that he was required as a condition of his mandatory supervised release to be on electronic monitoring at all. So why is that an occasion for punishment as opposed to simply saying you've raised a question we're going to look into it you know maybe there's going to be a postponement of a week but we're not going to suddenly throw you in solitary confinement for raising a good faith question about what exactly the terms of release will be? I mean it's is it the position of the state of Illinois that that inmates have no right to make sure that they're being released on No your honor that's not the position of the state of Illinois. The issue is is that Mr. Whitfield at the time of these conversations with with Ms. Spiller didn't provide any reason to contradict those those sentencing orders that she relied on here if he does he points he points to the signature page which certainly doesn't seem to pertain to his situation. Now maybe he was mistaken himself you know but but why as a matter of the exercise of his first amendment rights you're prohibiting from even having this conversation is what you're arguing for. No I don't I don't think that that's the case your honor because if you look to the both the circuit court order and the corresponding prisoner review board order it was mandated that his mandatory supervised release was subject to electronic monitoring and at the time of his conversation on January 7th and also his grievance on January 11th his primary complaint was that he wasn't supposed to be on electronic monitoring whatsoever. But as I understand Mr. Baddorf-Barnes he seems to be drawing a distinction between electronic monitoring generally and this particular electronic detention program agreement more specifically and you seem to be conflating them so I would like some clarification there. Well I think that they I apologize your honor did I cut you off? No no no no not at all. Oh um no I think that the we have to look at them together because we have to look at what Miss Spiller knew at the time of her actions and when we look at what she knew at the time of her actions his primary complaint was that he did not believe that he was supposed to be on electronic monitoring period and if we look to what she knew at that particular point we have this the circuit court order which mandated that he was subject to electronic monitoring and we have the corresponding prisoner review board order. No I understand that but he would be subject to I'm thinking of like federal prison he would be subject to electronic monitoring without signing a piece of paper that says and I know I'm subject to electronic monitoring we release prisoners the BOP releases prisoners all the time and their conditions of supervised release and and that's imposed by the court it's not there because the prisoner or or now the the person who's been released has agreed you know he's worried that he's being asked to sign something that he doesn't think applies to him and he could be then held to waived rights he could be then held to any number of conditions that he doesn't even know about. Your honor that may be the case but I think we also have to look at what is the specific deprivation upon which Mr. Whitfield is basing these claims and I think it's important to focus that he is basing these claims on the segregation that he was sent to following the ticket and also the three months exactly his claims are the punishment he receives for raising a good faith dispute about the conditions of his release and the state says no you can you you're forbidden to have you you have no right to ask a question is what the state is saying you have no right to make sure that there isn't any mistake in the papers. Your honor I think we have to look to what was Miss Spiller's role in that and and when we look to what her role was in the time that Mr. Whitfield spent in segregation we can see that she was not responsible for any of the time that Mr. Whitfield actually spent in segregation so if we bring this back to her she was she was the one who originally says if you don't sign this uh I'm going to write up a you know a ticket on you and you're off off he goes immediately to segregation there's no intervening person. Well your honor if we look to um what she specifically testified at deposition she did not say that she was the person who wrote the ticket in fact it was a different officer who wrote the disciplinary ticket and she also testified at she instructed that officer to write the ticket while she may have instructed the officer to write the ticket your honor she was not responsible for determining whether or not an inmate such as Mr. Whitfield is taken to segregation after a disciplinary ticket is issued she testified at deposition that that's not her responsibility that is not within her power to do and nor is it within her power or her role to participate in the adjustment committee hearing which ultimately sentenced him to three months in segregation and in in addition to that I do want to note that when it comes to the three months that he spent in segregation following the adjustment hearing um I I think it's important to note that in their decision the adjustment committee specifically noted that Mr. Whitfield had a class x felony on his record and therefore was required to be on electronic monitoring pursuant to that so this so you still haven't answered my question though about the distinction between the electronic detention program agreement what what does that add to a general requirement of electronic monitoring if anything well your honor I think it goes to the general paperwork that inmates are required to sign upon release and it wasn't a matter of um but why is it an agreement then is it an agreement I mean what I just don't understand what this program adds your honor the the program adds that they that the inmate acknowledges that they are going to be subject to um the the terms and conditions of their electronic monitoring it it isn't a question as to whether or not he was required to be on electronic monitoring that wasn't at issue and that's the information that Miss Spiller had before her when she had these conversations and I think it's important to note the the limited nature of her involvement in this case what she had before her at the time was his chief complaint that he was not supposed to be on electronic monitoring whatsoever and yet she has these two orders that state that he is required to be on electronic monitoring and that's even buttressed by the adjustment committee hearing but all that means all that means is well she never looks into the statute she never looks into I mean because what he's saying though is I'm not signing this piece of paper of course he eventually does 13 days later he signs it and she somewhat vindictively apparently um says yeah but he already committed the violation let's leave him you know in segregation let's you know even though he had by that time which which the committee noted by that time he had fixed the whole problem and the committee says fine you're still eligible for um mandatory supervised release uh etc but she she pursues him notwithstanding the fact that 13 days later he signs maybe maybe somebody actually gave him the full form by then who knows your honor I appreciate you uh allowing me the opportunity here to clarify a um when opposing counsel refers to uh this prisoner review board hearing in February this was not an issue of the prisoner review board actually hearing Mr. Whitfield's case if we look to the form it was merely a continuation of Mr. Whitfield's prisoner review board hearing so there wasn't any determination that he was eligible for release during that hearing and Ms. Filler was not involved in that hearing whatsoever in fact there's no record there's no evidence in the record that she was personally involved in anything um that had to do with Mr. Whitfield's release after her after she responded to the January 11th grievance that's the only evidence in the record of Ms. Filler's personal involvement in this issue and when it comes to um Ms. the Spiller um somehow was involved in the housing issue um later on that that summer after uh it was her job wasn't it I thought that was the job of her office so are we saying she wasn't doing her office's job true your honor but we have to look to the standard of personal responsibility for a section 1983 claim but we have some evidence in the record of course there's we all agree there's personal responsibility as a requirement but um there's some testimony that she actually has a conversation with Mr. Whitfield about this your honor if we look in the record to the exact uh citation that Mr. Whitfield relies on for this supposed conversation it is a June 2010 letter that he sent to the prisoner review board whereby he alleges that the department or its staff are angry at me for intentionally delaying uh my housing plan that's what he says in this letter he does not name Ms. Spiller um personally uh and Ms. Spiller is not a member of this resource department nor is she the supervisor so does she supervise does she supervise the field services and the record office your honor i believe that she does um but even if we look to the standard for um a section 1983 claim we have to see a supervisor is not liable under section 1983 merely by the nature of their role as a supervisor but they need to provide evidence that the supervisor knew of and condoned um that those actions that violated the individual's constitutional rights and we simply do not have that evidence in the record regarding Ms. Spiller's conduct um across the entire board let alone with this housing issue thank you thank you Ms. Scholl Mr. Barnes thank you your honor so i'd like to first push back against the idea that uh his primary concern was not signing this form uh his primary complaint was that he was being asked to sign this form uh when asked during and and that's and Spiller understood it this way as well when when asked during her deposition whether she was aware that he believed his rights were being violated by having to sign the MSR paperwork she responded that was the biggest part of their conversation which was a multi-hour conversation on January 7th and and Mr. Whitfield was not you know whether or not Mr. Whitfield believed he didn't have to be on electronic monitoring Mr. Whitfield believed would have complied with electronic monitoring and that issue never came up Mr. Whitfield was not released because he didn't sign a form Spiller never raises any concern that he wasn't going to comply with his electronic monitoring conditions or that the his his failure to comply with those conditions his potential failure to comply with those conditions uh was played any part in her decision to not release him on January 7th with respect to the adjustment committee um so Spiller was the one who decided to have this ticket issued and it was marked as a major offense for failing to obey a direct order and by by characterizing it as a major offense that's what caused the adjustment committee hearing to occur it was her intent for the adjustment committee to punish him she sent him to the adjustment committee to be punished and he was punished and the infraction he committed was the exercise of his first amendment right so any punishment that the adjustment committee handed down would have been retaliatory so she's involved in that punishment uh so you know the those those three months are certainly attributable attributable to her as well thank you thank you Mr. Barnes thanks to both counsel and the cases taken under advisement